1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

IMPERIAL IRRIGATION DISTRICT,

Plaintiff,

v.

CALIFORNIA INDEPENDENT
SYSTEM OPERATOR CORPORATION,

Defendant.

Case No.: 15-CV-1576-AJB-RBB

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S
MOTION TO DISMISS**

(Doc. No. 16)

Presently before the Court is Defendant California Independent System Operator Corporation's ("CAISO") motion to dismiss Plaintiff Imperial Irrigation District's ("IID") complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 16.) IID opposes the motion. (Doc. No. 18.) The Court finds the matter suitable for decision on the papers, without oral argument, pursuant to Local Civil Rule 7.1. The Court **GRANTS IN PART AND DENIES IN PART** CAISO's motion.

## BACKGROUND[1]

This dispute centers on nondiscriminatory access to California's electric

---

[1] Unless otherwise noted, all allegations are taken from the complaint. (*See* Doc. No. 1.)

transmission grid. To fully understand the issues underlying the instant motion, some background concerning the electric power transmission industry must be laid.

Up until the late 20th Century, electricity was largely a matter of local concern, with local generating facilities serving their respective geographic regions. The utility companies that owned and controlled these facilities were predominately vertically integrated, in that they sold generation, transmission, and distribution services as a bundled package to their local retail customers. While technological advances and changes in the law increased entry into wholesale markets for electric power generation and created a need for greater access to transmission services, the vertically-integrated utilities were able to use their monopoly control to exclude potential competitors.

In response, Congress enacted the Federal Energy Policy Act ("FEPA") in 1992, which fundamentally changed how the electric transmission system (also referred to as "electric transmission grid" or "grid") was owned and operated nationally. FEPA enabled entities known as independent system operators ("ISOs") to enter energy markets. The Federal Energy Regulatory Commission ("FERC") encouraged the vertically-integrated utilities to relinquish control over their transmission systems to the ISOs for independent operation to facilitate the goal of nondiscriminatory access to the grid.

Subsequently, FERC Order No. 888 required all jurisdictional public utilities to unbundle wholesale electric power services and to file open access, nondiscriminatory transmission tariffs, thereby allowing all market participants to gain competitive and nondiscriminatory access to the electric transmission system, which was required for electric generators to serve wholesale customers and end consumers. Although not required, FERC strongly encouraged ISO formation so as to provide transmission services separate from sales of electric energy.

ISOs coordinate, control, and monitor the operation of electric power systems. They manage, but do not own, the transmission assets within their geographic areas. Those assets are owned by independent transmission companies, generation and

transmission cooperatives, transmission agencies, and local utility companies, including for-profit investor-owned utilities ("IOUs").

In California, there are eight entities ("balancing authorities") providing electric power transmission services and transmission operations services, each serving a separate balancing authority area ("BAA") within the state. IID and CAISO are two of these entities. IID is headquartered in Imperial, California, and provides electric power primarily to customers in the Imperial Valley and parts of Riverside and San Diego counties. CAISO is a non-governmental entity that the State of California created pursuant to California Assembly Bill 1890. It was incorporated in California in 1997 and is headquartered in Folsom, California.

IID alleges it competes with CAISO in two markets: the transmission service market and the transmission operations services market. The transmission service market is "the market for transmitting electricity across high voltage, long-distance, power lines within the state of California, for delivery to customers outside California taking service on interconnected electricity transmission systems." The transmission operations services market is a market where the balancing authorities perform operations services within their respective BAAs, including (1) managing the operation, supervising the maintenance, and planning the expansion of a high-voltage electric transmission network; (2) granting transmission service to wholesale electricity customers; and (3) managing the process of interconnection of new generation and transmission to a high-voltage electric transmission network. IID alleges CAISO controls at least 80 percent of each market within California. CAISO's participating transmission owners ("PTOs") own the vast majority of electric transmission assets in California.

CAISO controls access to its transmission grid, having the power to grant or deny access to services on its grid and to determine the terms under which such access is granted. Access to CAISO's grid is necessary for customers on the CAISO system who wish to purchase electricity from any electric generation source. Access to the CAISO system's transmission service is likewise necessary for sellers of electricity from any

generation source who wish to deliver the energy from their facilities to customers located on the CAISO grid. IID alleges it cannot provide existing and potential customers electric transmission service that originates within its BAA and terminates within or travels across CAISO's grid absent CAISO's express permission.

CAISO also has the authority, under FERC Order No. 888 and its FERC-approved tariff, to calculate an entity's "maximum import capability" ("MIC"), that is, the maximum amount of power that can be safely and reliably imported from one entity's control area to another's. CAISO has historically set IID's access to the CAISO system to a MIC of 462 megawatts ("MW"). In other words, IID can export from its BAA onto or through the CAISO grid only 462 MW of electric power.

In 2011, CAISO's management provided its Board of Directors with a memorandum identifying certain elements of the "2010/2011 Transmission Plan" to support California's renewable energy goals, one element being the reconductoring of Path 42, a transmission line that runs from IID's Coachella Valley station to Southern California Edison Company's ("SCE") Devers substation.[2] Undertaking certain upgrades on both IID's and SCE's sides of the line "would allow IID's MIC to be increased to 1400 MW." CAISO approved the Transmission Plan, including the Path 42 upgrades. In August 2011, in reliance on CAISO's approval, IID's Board of Directors approved the Path 42 upgrades within IID's territory.

IID alleges CAISO was aware of IID's approval of the upgrades, even discussing the plans in its "2011/2012 Conceptual Statewide Transmission Plan Update." In its "2012/2013 Transmission Plan," CAISO acknowledged that IID's target MIC for 2019 was 1400 MW. IID alleges that in reliance on CAISO's approval and statements, IID

---

[2] SCE is one of CAISO's largest PTOs, along with San Diego Gas & Electric Company ("SDG&E") and Pacific Gas & Electric Company ("PG&E").

commenced the Path 42 upgrades on or about October 1, 2013.[3] The upgrades were completed and placed into service in January 2015, after IID spent nearly $35 million.

On July 30, 2014, CAISO announced a change in its "forecast for additional deliverability from the Imperial zone above the existing 462 MW," reducing IID's prospective MIC "from 1700 MW to zero MW."[4] This change in IID's prospective MIC was purportedly based on the closure of the San Onofre Nuclear Generating Station ("SONGS"), which SCE and SDG&E owned and which provided 2200 MW of baseload power. CAISO defined the "Imperial zone" as including both "IID and [CAISO] new generation in the Imperial County," even though IID's BAA comprised 98 percent of the county. CAISO determined that while "recent transmission additions 'had restored the future additional amount of deliverability for the overall Imperial zone to up to 1000 MW,' . . . the generation connecting directly to CAISO's grid 'is expected to fully utilize [all 1000 MW of] transmission capacity."

IID conducted its own investigation into whether SONGS' closure was the true cause for the reduction to IID's prospective MIC. Through its investigation, IID allegedly discovered that "CAISO had violated one of its own planning procedures and, as a result, had clearly miscalculated the flow of the Southwest Powerlink ("SWPL") transmission line . . . . When IID recalculated the MIC on the correct SWPL transmission flow, it determined that the correct MIC calculation was 1400 MW without the need for any additional transmission upgrades."

IID alleges CAISO has extensively used IID's transmission lines and infrastructure to import substantial out-of-state power without compensating IID for this use. IID alleges CAISO's actions were motivated by its intent to further its monopolistic position in the relevant markets by forcing IID to join CAISO as a PTO.

---

[3] CAISO continued stating its approval of the Path 42 upgrades as late as June 18, 2014.
[4] Paragraph 152 of the complaint is the only place in which IID alleges its prospective MIC was set at 1700 MW. All other references to IID's prospective MIC refer to it as 1400 MW. (*See, e.g.*, Doc. No. 1 ¶¶ 97, 100, 116, 128, 141, 158, 169.)

5

On July 16, 2015, IID filed the instant action, alleging claims for monopolization and attempted monopolization in violation of § 2 of the Sherman Act, as well as state law claims for breach of implied contract, conversion, *quantum meruit*, and restitution. CAISO now moves to dismiss all clams alleged against it for failure to state a claim upon which relief may be granted. (Doc. No. 16.) IID filed an opposition, (Doc. No. 18), and CAISO filed a reply, (Doc. No. 20).

## LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Plaintiffs must also plead, however, "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard thus demands more than a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, the complaint "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

In reviewing a motion to dismiss under Rule 12(b)(6), courts must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). The court need not take legal conclusions as true "merely because they are cast in the form of factual allegations." *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)) (internal quotation marks omitted). Similarly, "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. Fed. Deposit Ins. Corp.*, 139 F.3d 696, 699 (9th Cir. 1998).

In determining the propriety of a Rule 12(b)(6) dismissal, courts generally

may not look beyond the complaint for additional facts. *See United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003). Where dismissal is appropriate, a court should grant leave to amend unless the plaintiff could not possibly cure the defects in the pleading. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009).

D<span style="font-variant:small-caps">ISCUSSION</span>

## I.   Whether FERC has Exclusive Jurisdiction Over IID's Claims

CAISO first argues IID's complaint, as a whole, must be dismissed because FERC has exclusive jurisdiction over IID's claims by virtue of the filed rate doctrine and preemption. (Doc. No. 16-1 at 15–19.) IID counters, arguing FERC has no jurisdiction over antitrust claims, the filed rate doctrine does not apply, and its state law claims are not preempted. (Doc. No. 18 at 10–20.)

### A.   Antitrust Claims

IID first contends that FERC has no jurisdiction, let alone exclusive jurisdiction, over antitrust claims, relying on *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973) [hereinafter *Otter Tail*]. (Doc. No. 18 at 10–12.) CAISO argues *Otter Tail* plays no role here because it is not arguing antitrust immunity. (Doc. No. 20 at 7–8.)

In *Otter Tail*, the defendant ("Otter Tail") "had attempted to monopolize and had monopolized the retail distribution of electric power in its service area in violation of" the federal antitrust laws by attempting "to prevent communities in which its retail distribution franchise had expired from replacing it with a municipal distribution system." 410 U.S. at 368. Otter Tail argued that "by reason of the Federal Power Act it is not subject to antitrust regulation with respect to its refusal to deal." *Id.* at 372. The Court disagreed, holding that "[a]ctivities which come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws." *Id.*

It is true there is no "antitrust immunity" for FERC-regulated entities. *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 422 (1986). However, unlike Otter Tail, CAISO is *not* arguing immunity from the antitrust laws. (*See* Doc. No. 16-1 at 15–19; Doc. No. 20 at 7–8.) Rather, CAISO argues the filed rate doctrine's application to

7

this case puts it within FERC's exclusive jurisdiction. (*See id.*) Applying the doctrine under such circumstances, even where antitrust violations are asserted, does not run afoul of *Otter Tail*. *See Cnty. of Stanislaus v. Pac. Gas & Elec. Co.*, 114 F.3d 858, 862 (9th Cir. 1997) ("Since the 1920s, the 'filed rate' or 'filed tariff' doctrine has barred antitrust recovery by parties claiming injury from the payment of a filed rate for goods or services." (citing *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156 (1922))).

Accordingly, the Court rejects IID's argument that its assertion of antitrust violations strips FERC of any jurisdiction it may have over this case.

## B.   The Filed Rate Doctrine

The filed rate doctrine, first recognized by the Supreme Court in *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156 (1922), provides that the terms of a federally-regulated entity's tariff "are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' of the contracting parties."[5] *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 853 (9th Cir. 2004) [hereinafter *Dynegy*] (citing *Evanns v. AT&T Corp.*, 229 F.3d 837, 840 & n.9 (9th Cir. 2000)). Accordingly, the doctrine "bars all claims—state and federal—that attempt to challenge [the terms of a tariff] that a federal agency has reviewed and filed." *Evanns*, 229 F.3d at 840 (quoting *Cnty. of Stanislaus*, 114 F.3d at 866). In other words, the doctrine does not permit "state law, and some federal law (*e.g.*, antitrust law)," to "invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question." *Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 929 (9th Cir. 2002) [hereinafter *TANC*] (citing *Cnty. of Stanislaus*, 114 F.3d at 862–63).

CAISO argues that because IID's claims arise from IID's alleged entitlement to

---

[5] "A 'tariff' is a document that a regulated firm files with its regulatory agency, requesting that it be required to charge certain prices, offer certain prices, offer certain packages of services, have certain policies respecting treatment of customers, and the like." *Cost Mgmt. Servs., Inc. v. Wash. Natural Gas Co.*, 99 F.3d 937, 940 n.1 (9th Cir. 1996) (internal citation and quotation marks omitted).

greater import capacity and CAISO's calculation of IID's MIC, the claims fall squarely within the filed rate doctrine's ambit. (Doc. No. 16-1 at 17.) CAISO further argues that because the doctrine prohibits "assuming hypothetical allocations of interstate transmission capacity," *TANC*, 295 F.3d at 932, IID's claims must fail because calculating any damages will be impossible "without assuming that the MIC calculation yielded some result other than the amount CAISO calculated pursuant to its FERC-approved tariff," (Doc. No. 16-2 at 17–18).

IID counters that the filed rate doctrine does not apply for several reasons: (1) its claims have "nothing to do with rates"; (2) the prohibition against "assuming hypothetical allocations of interstate transmission capacity" has no bearing on its claims because there is "an *actual*, not hypothetical, allocation of additional" MIC; (3) CAISO's FERC-approved tariff plays no role because IID "does not refer to CAISO's tariff [in its complaint] and certainly does not agree that CAISO complied with it"; and (4) the competitor exception applies. (Doc. No. 18 at 10–15.)

1.     **"Rates"**

IID first argues the filed rate doctrine is inapplicable because its claims have "nothing to do with rates" as none of the alleged misconduct "directly affects" CAISO's rates. (*Id.* at 12–13.) CAISO counters that even if this is the relevant test, allocation of transmission capacity satisfies it. (Doc. No. 20 at 6–7.)

While the filed rate doctrine is couched in terms of "rates," it is not read so narrowly as to apply only to claims dealing specifically with rates charged. *See Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986) [hereinafter *Nantahala*] (citing *N. Natural Gas. Co. v. Kansas Corp. Comm'n*, 372 U.S. 84, 90–91 (1963)). The doctrine is also applicable to claims challenging "any allocation of power that directly affects rates," including allocation of transmission capacity. *TANC*, 295 F.3d at 930 (citing *Nantahala*, 476 U.S. at 966–67); *see also id.* at 931 ("FERC's regulation of interstate rates now operates through FERC's regulation of open access to transmission capacity."). "[C]laims of entitlement to a specific allocation of interstate transmission

capacity" thus fall within the doctrine's purview. *Id.* at 931.

IID's position that its entitlement to 1400 MW of import capacity has "nothing to do with rates" has no clout in light of the Ninth Circuit's holding in *TANC*. There, the plaintiff ("TANC") agreed to jointly construct and operate the California Oregon Intertie with the defendants. *TANC*, 295 F.3d at 923. In exchange for the defendants' agreement to upgrade the Northwest AC Intertie, TANC agreed to construct a new transmission line and connect that line to the Pacific AC Intertie, which formed the California Oregon Intertie. *Id.* The parties agreed to connect the California Oregon Intertie to the Northwest AC Intertie. *Id.* Five years later, one of the defendants announced its decision to join the Northwest AC Intertie with the Alturas Intertie. *Id.* Doing so, however, created a megawatt-for-megawatt reduction to the California Oregon Intertie's capacity. *Id.* TANC unsuccessfully protested the Alturas Intertie connection to FERC. *Id.* TANC thereafter brought suit in state court, which was removed to federal court, alleging a variety of claims, including intentional misrepresentation. *Id.* at 924. The district court dismissed all claims against the utility company defendants, finding the Federal Power Act preempted the claims. *Id.* at 927. In affirming the district court, the Ninth Circuit held the filed rate doctrine preempted TANC's intentional misrepresentation claim, concluding "[t]he impact of any award of damages to TANC for [defendant's] alleged misrepresentation would be to undermine FERC's ability to regulate rates" because it "would necessarily assume that, but for [defendant's] alleged fraud, FERC would have made a specific allocation of electricity to TANC." *Id.* at 933.

Like TANC, IID's claims are all predicated on its reliance on CAISO's representations, which allegedly induced it to construct the Path 42 upgrades in exchange for a prospective increase to IID's MIC. (Doc. No. 1 ¶¶ 97, 116, 120–25, 131–33, 135–39, 141, 144–46.) Because these claims all turn on the assumption that IID was entitled to a larger allocation of import capability—either by virtue of CAISO's alleged promises connected with the Path 42 upgrades or the correct calculation of the MIC, (*see id.* ¶¶ 162–63)—that IID's claims do not specifically mention "rates" is not reason, by itself, to

conclude the filed rate doctrine does not apply. *See Nantahala*, 476 U.S. at 966–67; *TANC*, 295 F.3d at 930–31; *see also Dynegy*, 375 F.3d at 851 ("[O]ur cases specifying the nature and scope of exclusive FERC jurisdiction make clear that the interstate 'transmission' . . . of wholesale energy pursuant to a federal tariff—*not merely 'rates'*—falls within FERC's exclusive jurisdiction.") (emphasis added). Accordingly, the Court rejects IID's first argument.

Furthermore, to the extent IID predicates its state law claims on an alleged contract between the parties, this argument is foreclosed by the Supreme Court's decision in *AT&T Corp. v. Central Office Telephone, Inc.*, 524 U.S. 214 (1998). In that case, the plaintiff ("COT"), a long-distance service reseller, contracted with AT&T to purchase long-distance service in bulk. *Id.* at 218–19. In signing the agreement, COT relied on an AT&T salesperson's representations, although the contract itself provided that AT&T's tariff would govern the contract. *Id.* When the service and billing practices did not match up to the salesperson's representations, COT filed suit against AT&T for breach of contract and tortious interference with a contract. *Id.* at 219–20. The Court concluded the filed rate doctrine barred COT's claims, stating that "even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff." *Id.* at 222 (citing *Kansas City S. Ry. Co. v. Carl*, 227 U.S. 639, 653 (1913)).

The Court's reasoning in *Central Office Telephone* applies with full force here. Assume for the sake of illustration that CAISO's calculation of IID's MIC was correct under its tariff.[6] In that situation, the only basis for relief for IID would be if the Court

---

[6] The Court is cognizant that it must assume the truth of the complaint's allegations when ruling on a Rule 12(b)(6) motion. *Cahill*, 80 F.3d at 337–38. The Court makes this assumption, notwithstanding IID's allegations to the contrary, (*see* Doc. No. 1 ¶¶ 162–63), only to illustrate why IID's claims must fail to the extent they are based on an alleged contract. At its heart, such claims seek to do what cannot be done under the filed rate doctrine, that is, to obtain a specific allocation to which IID is not entitled under CAISO's tariff. *See TANC*, 295 F.3d at 930–31, 933 (holding the filed rate doctrine

accepted that a contract existed between the parties and that CAISO breached it, which would entitle IID to the 1400 MW MIC, even if under CAISO's tariff IID is entitled to only 462 MW. Awarding relief under those circumstances would work to "invalidate, alter or add to the terms of [CAISO's] filed tariff," a prohibited outcome under controlling case law. *See Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1170 (9th Cir. 2002) ("[N]o one may bring a judicial proceeding to enforce any rate other than the rate established by the filed tariff. If [a federally-regulated entity] contracts to provide a service at a rate different from that of the filed tariff, *that contract is unenforceable*.") (emphasis added); *Evanns*, 229 F.3d at 840 ("Under th[e filed rate] doctrine, once a carrier's tariff is approved by [a federal agency], the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer.") (internal citations omitted).

Accordingly, the Court finds the filed rate doctrine preempts IID's state law claims to the extent IID asserts entitlement to relief based on the existence of an alleged contract between the parties that conflicts with or adds to CAISO's tariff. The Court therefore **GRANTS IN PART** CAISO's motion to dismiss and **DISMISSES WITHOUT PREJUDICE** IID's state law breach of implied contract claim. The Court also **DISMISSES WITHOUT PREJUDICE** IID's state law *quantum meruit* and restitution claims, as these claims are entirely derivative of the breach of implied contract claim. (*See* Doc. No. 18 at 16) (explaining IID seeks the same relief under all three claims). *See also Cent. Office Tel.*, 524 U.S. at 226 ("Our analysis [as to the contract claim] applies with equal force to [plaintiff's other state law claims] because [they are] wholly derivative of the contract claim . . . .").

//

---

applicable because to do otherwise "would necessarily assume that, but for [defendant's] alleged fraud, FERC would have made a specific allocation of electricity to [plaintiff]").

## 2. "Hypothetical" v. "Actual" Allocations of Transmission Capacity

IID next argues the prohibition against "assuming hypothetical allocations of interstate transmission capacity" has no bearing on its claims because there is "an *actual*, not hypothetical, allocation of additional" MIC. (Doc. No. 18 at 14.) CAISO counters that regardless whether this case involves a hypothetical allocation or an actual allocation, *TANC* forecloses IID's argument. (Doc. No. 20 at 7.)

Like its first argument, this argument fails under *TANC*. There, the Ninth Circuit recognized that FERC Order No. 888 "functionally combined FERC regulation of rates with FERC regulation of transmission capacity." *TANC*, 295 F.3d at 931. Rather than set rates directly, FERC now sets rules requiring open access to transmission lines at uniform, openly disclosed rates. *Id.* Accordingly, "any right to a particular allocation of interstate transmission capacity must now be considered an exclusive matter of federal law." *Id.* Thus, "FERC's exclusive jurisdiction over the interstate transmission of electricity extends to any claims of entitlement to a specific allocation of interstate transmission capacity, whether that claim asks a court to enforce such an alleged entitlement *or* merely to hypothetically assume it." *Id.* (emphasis added).

Based on the Ninth Circuit's holding in *TANC*, the Court rejects IID's assertion that the filed rate doctrine does not apply because it is entitled to "an *actual*, not hypothetical, allocation of additional" of MIC.

## 3. CAISO's Tariff

IID next argues that CAISO's FERC-approved tariff plays no role in this case because IID "does not refer to CAISO's tariff [in its complaint] and certainly does not agree that CAISO complied with it."[7] (Doc. No. 18 at 14.) CAISO argues it is undisputed

---

[7] IID also insinuates the Court may not consider CAISO's tariff at all because CAISO did not request "judicial notice of the tariff, and the tariff is not before the Court." (Doc. No. 18 at 9–10.) The Court agrees with CAISO, (*see* Doc. No. 20 at 6 n.1), that judicial notice is not required because the tariff is filed with FERC and is therefore "the equivalent of a federal regulation." *Dynegy*, 375 F.3d at 839 (internal citations omitted). Furthermore,

that its FERC-approved tariff provides the manner in which MICs are calculated and requires it to submit quarterly reports of import capacity to FERC. (Doc. No. 20 at 6.)

While the filed rate doctrine precludes court review of claims affecting rates that are charged or allocations of transmission capacity made pursuant to a FERC-approved tariff, the doctrine is not read so broadly as to preempt a court's jurisdiction in any matter that may touch upon a federally-regulated entity's tariff. *See Brown*, 277 F.3d at 1170 (citing *Cent. Office Tel.*, 524 U.S. at 223). While courts may not decide "whether a tariff is reasonable"—an inquiry reserved for FERC—the doctrine "does not preclude courts from interpreting the provisions of a tariff and enforcing that tariff." *Id.* at 1171–72.

As an initial matter, IID argues CAISO calculated the MIC under its business procedure manual ("BPM"), not its tariff. (Doc. No. 1 ¶ 162; Doc. No. 18 at 18–19.) CAISO argues in turn that its tariff provides the procedures by which CAISO calculates import capability. (Doc. No. 20 at 6.) *See also Cal. Indep. Sys. Operator Corp.*, 119 FERC ¶ 61,164, ¶¶ 62,012–13 (2007) (accepting CAISO's proposal of "a 13-step process under section 40.5.2.2.1 [of its tariff] for assigning resource adequacy import capability."). While IID points to CAISO's 2012/2013 Transmission Plan, which states IID's prospective MIC was calculated in accordance with CAISO's BPM, the Court cannot ignore that CAISO's tariff provides the FERC-approved process for calculating import capability. *Cal. Indep. Sys. Operator Corp.*, 119 FERC ¶ 62,013. To the extent the calculations under each set of procedures conflict, CAISO's tariff controls, and the filed

---

even if judicial notice of CAISO's tariff is required, the Court concludes it is the proper subject of such notice. "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). CAISO's tariff, filed with and approved by FERC, clearly meets the second prong of the test. Furthermore, CAISO's failure to request judicial notice does not affect the Court's ability to do so *sua sponte*. *See* Fed. R. Evid. 201(c)(1) (stating the Court "may take judicial notice on its own").

rate doctrine applies. *Brown*, 277 F.3d at 1170 (stating that negotiated rates deviating from the tariff-approved rate are unenforceable to the extent of a conflict).

Taking the allegations of the complaint as true, the Court finds IID has sufficiently stated facts from which the Court to conclude IID's surviving claims fall outside the purview of the filed rate doctrine. IID alleges it conducted its own investigation into the reasons behind the reduction to its prospective MIC. (Doc. No. 1 ¶¶ 160–61.) From its investigation, IID concluded the true cause for the reduction was CAISO's violation of "one of its own planning procedures," which resulted in the miscalculation of "the flow on the [SWPL] transmission line . . . ." (*Id.* ¶ 162.) IID alleges this miscalculation affected the calculation of its historic MIC. (*See id.* ¶ 163.) IID further alleges that had its MIC been properly calculated, "the correct MIC calculation was 1400 MW without the need for any additional transmission upgrades." (*Id.*)

To the extent IID argues CAISO miscalculated its MIC, the filed rate doctrine does not preclude the Court from "enforcing [CAISO's] tariff." *Brown*, 277 F.3d at 1171–72.[8] Accordingly, the Court **DENIES IN PART** CAISO's motion to dismiss to the extent IID's antitrust and conversion claims are predicated on CAISO's alleged miscalculation of IID's MIC under CAISO's tariff.[9]

---

[8] Permitting IID's claims to go forward on this basis, despite its claim of entitlement to a specific allocation of transmission capacity, does not run afoul of *TANC*. That case concerned TANC's claim of entitlement to the California Oregon Intertie's transmission capacity absent the megawatt-for-megawatt reduction that the Alturas Intertie caused, which FERC *rejected*. *See TANC*, 295 F.3d at 923. Here, a claim of miscalculation of prospective MIC is, at its heart, a claim that IID is not receiving the MIC that FERC *approved* via its approval of CAISO's tariff.

[9] Because the Court concludes the filed rate doctrine does not apply to the extent IID alleges CAISO miscalculated its MIC, the Court need not reach IID's final argument that the competitor exception applies. However, even if the Court were to reach that argument, the Court agrees with CAISO that it does not apply to the instant matter. The Ninth Circuit in *Cost Management Services, Inc. v. Washington Natural Gas Co.* recognized an exception to the filed rate doctrine, concluding the doctrine is inapplicable to "rate-related suits brought by competitors, as opposed to customers, of regulated

1

### C.   Preemption of IID's Remaining State Law Claims

2

CAISO next argues that IID's state law claims are preempted. (Doc. No. 16-1 at

3

18–19.) IID argues that neither field preemption nor conflict preemption apply because

4

its state law claims "do not affect 'interstate wholesale rate setting,'" and the manner in

5

which CAISO calculated IID's prospective MIC was not approved by FERC. (Doc. No.

6

18 at 16–20.) Because the only state law claim to survive the Court's filed rate doctrine

7

analysis is IID's conversion claim, the Court will consider only that claim in its

8

preemption analysis.[10] (Doc. No. 1 ¶¶ 203–05.)

9

"Federal preemption of state law is rooted in the Supremacy Clause, Article VI,

10

clause 2, of the United States Constitution." *TANC*, 295 F.3d at 928. Preemption of state

11

12

_____

13

entities." 99 F.3d 937, 943–45, 948 (9th Cir. 1996). However, the exception's application

14

makes sense only if limited to situations where the plaintiff is damaged in its *competitor*

role. *See Utilimax.com, Inc. v. PPL Energy Plus, LLC*, 378 F.3d 303, 308 (3d Cir. 2004)

15

("While the ramifications were felt in its competitor role, the damage to [plaintiff]

occurred because of its status as a customer of [defendant].") Like the plaintiff in

16

*Utilimax.com, Inc.*, while IID may have felt the ramifications of CAISO's alleged

17

anticompetitive behavior in its capacity as a competitor, that is, IID's ability to reach

customers on CAISO's grid, IID's alleged damage occurred in its status as a *customer* of

18

CAISO's electric transmission services. Surely, access to CAISO's grid is not without

19

cost. (*See* Doc. No. 18 at 25) ("CAISO and IID had a voluntary relationship whereby

each received fees for transmission services and transmission operation services derived

20

from the transmission of electricity between one another's [BAA]"). Such an

21

understanding of the parties' relationship is consistent with IID's complaint that CAISO

impermissibly used IID's grid without compensation. (*See* Doc. No. 1 ¶¶ 168, 203–05.)

22

[10] IID points out that "CAISO does not assert that IID's federal claims under [§] 2 of the

23

Sherman Act are preempted." (Doc. No. 18 at 16.) However, the doctrine of preemption

governs the interplay between federal law and state law, not competing federal statutes.

24

*See TANC*, 295 F.3d at 928 ("Federal preemption of *state law* is rooted in the Supremacy

25

Clause, Article VI, clause 2, of the United States Constitution.") (emphasis added). The

latter relationship is properly governed by the "cardinal principle of construction . . . [that

26

w]hen there are two [federal] acts upon the same subject, the rule is to give effect to both

27

if possible." *United States v. Borden Co.*, 308 U.S. 188, 198 (1939) (internal citations

omitted). Accordingly, the Court will not address whether IID's federal claims survive

28

preemption.

law "is compelled where Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977) (internal citations omitted). "In the absence of express preemption, federal law may preempt state claims in two ways . . . ." *Dynegy*, 375 F.3d at 849. "Field preemption" occurs where "Congress evidences an intent to occupy a given field . . . ." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984) (internal citations omitted). Where field preemption is not applicable, "conflict preemption" may nonetheless preempt state law claims "to the extent [state law] actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.* (internal citations omitted)

Neither party addresses the effect preemption has on IID's conversion claim. (*See* Doc. No. 16-1 at 18–19; Doc. No. 18 at 15–20; Doc. No. 20 at 9–10.) However, controlling case law makes clear that the transmission of electric energy in interstate commerce is a matter of federal concern. Congress, through the Federal Power Act, "delegated to [FERC] *exclusive* authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce . . . ." *New Eng. Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982) (citing *United States v. Pub. Utils. Comm'n of Cal.*, 345 U.S. 295 (1953)) (emphasis added); *see also Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1173 (9th Cir. 1997) ("Interstate transmission [of electricity] is clearly a federal matter.").

In its state law conversion claim, IID alleges CAISO impermissibly used IID's electric transmission grid to import out-of-state electricity without compensating it. (Doc. No. 1 ¶¶ 168, 203–05.) Under *New England Power Co.* and its progeny, whatever remedy to which IID may be entitled for this alleged conversion is within the exclusive jurisdiction of FERC. Accordingly, the Court **GRANTS** CAISO's motion to dismiss and **DISMISSES WITHOUT PREJUDICE** IID's state law conversion claim pursuant to the doctrine of field preemption.

1

## II.     Whether FERC Has Primary Jurisdiction

2      CAISO next argues the doctrine of primary jurisdiction requires dismissal. (Doc.

3   No. 16-1 at 20–21.) IID counters that the doctrine does not apply because FERC has no

4   jurisdiction over antitrust claims.[11] (Doc. No. 18 at 20–21.)

5      The primary jurisdiction doctrine is a vehicle by which courts may "stay

6   proceedings or . . . dismiss a complaint without prejudice pending the resolution of an

7   issue within the special competence of an administrative agency." *Clark v. Time Warner*

8   *Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008). Although there is "[n]o fixed formula . . . for

9   applying" the doctrine, *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956), courts

10   in the Ninth Circuit have generally held the doctrine applicable where there is "(1) the

11   need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an

12   administrative body having regulatory authority (3) pursuant to a statute that subjects an

13   industry or activity to a comprehensive regulatory authority that (4) requires expertise or

14   uniformity in administration," *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307

15   F.3d 775, 781 (9th Cir. 2002) (citing *United States v. Gen. Dynamics Corp.*, 828 F.2d

16   1356, 1362 (9th Cir. 1987)). However, the doctrine should be used only if a claim

17   "requires resolution of an issue of first impression, or of a particularly complicated issue

18   that Congress has committed to a regulatory agency," *Brown*, 277 F.3d at 1172 (citing

19   *Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 442 (1907)), or if

20   "protection of the integrity of a regulatory scheme dictates preliminary resort to the

21   agency which administers the scheme," *United States v. Phila. Nat'l Bank*, 374 U.S. 321,

22   353 (1963) (internal citations omitted).

23      The Ninth Circuit's holding in *Brown* forecloses CAISO's argument that the

24   primary jurisdiction doctrine applies. In that case, the Ninth Circuit held that "[i]f

25   resolution of [plaintiff's] claim involves a straightforward interpretation of [defendant's]

26

27   _____

28   [11] As discussed above, the Court rejects IID's argument that FERC has no jurisdiction
over antitrust claims. *See supra* Discussion Section I.A.

filed tariff, the [Court] will be competent to resolve the claim without resort to" FERC. 277 F.3d at 1173. As discussed above, IID's surviving claims turn on the alleged miscalculation of its MIC. *See supra* Discussion Section I.B.3. At this juncture, and similar to *Brown*, it appears IID's entitlement to relief will require only "a straightforward interpretation of [CAISO's] filed tariff," an issue that does not require FERC's expertise. 277 F.3d at 1173. Accordingly, the Court **DENIES** CAISO's motion to dismiss with respect to the primary jurisdiction doctrine.

### III.   Whether the Complaint States a Plausible Claim for Relief

CAISO's final argument is that IID's complaint fails to state a plausible claim for monopolization and attempted monopolization.[12] (Doc. No. 16-1 at 21–28.) CAISO argues that IID has failed to allege either exclusionary conduct or antitrust injury. (Doc. No. 16-1 at 23–28; Doc. No. 20 at 11–13.) IID counters that its claims are adequately stated under the *Iqbal/Twombly* standard. (Doc. No. 18 at 23–29.)

Section 2 of the Sherman Act makes it unlawful for a person to monopolize or attempt to monopolize "any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2. However, "[t]o safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) [hereinafter *Trinko*]. Accordingly, to state a monopolization claim, a plaintiff must allege that the defendant "(1) possessed monopoly power in the relevant market, (2) wilfully acquired or maintained that power through exclusionary conduct and (3) caused antitrust injury." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004) (citing *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1151 (9th Cir.

---

[12] As IID's federal antitrust claims are the only claims to survive the Court's analysis of the filed rate doctrine, preemption, and primary jurisdiction, the Court will consider only arguments concerning those claims.

1997)). The conduct element requires "the use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997) (quoting *Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 482–83 (1992)).

The elements of an attempted monopolization claim are similar, but differ "primarily in the requisite intent and the necessary level of monopoly power." *Id.* at 1202 (citing *Cal. Computer Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 736–37 (9th Cir. 1979)). To sufficiently plead an attempted monopolization claim, the plaintiff must allege the defendant acted with the "specific intent to monopolize." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 893 (9th Cir. 2007); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) (stating attempted monopolization requires the "'specific intent' to accomplish the forbidden objective").

### A.   Exclusionary Conduct

CAISO argues that IID has failed to sufficiently allege exclusionary conduct, failing to state either a refusal to deal claim or an essential facilities claim. (Doc. No. 16-1 at 24–26.) IID argues the contrary. (Doc. No. 18 at 24–28.)

#### 1.   Refusal to Deal

It is axiomatic that "there is no duty to aid competitors." *Trinko*, 540 U.S. at 411. There is a narrow exception to this general rule, first recognized by the Supreme Court in *Aspen Skiing Co.*, 472 U.S. 585, at 610–11, permitting antitrust recovery where there is both "the unilateral termination of a voluntary and profitable course of dealing," *MetroNet Servs.*, 383 F.3d at 1132 (citing *Trinko*, 540 U.S. at 409), which would suggest "a willingness to forsake short-term profits to achieve an anticompetitive end," *Trinko*, 540 U.S. at 409 (citing *Aspen Skiing Co.*, 472 U.S. at 608, 610–11). The Supreme Court stressed the narrowness of this exception, however, urging courts to be "very cautious in recognizing such exceptions . . . ." *Trinko*, 540 U.S. at 408.

Like in *Trinko*, IID's complaint fails to fit CAISO's alleged anticompetitive

conduct into "the limited exception recognized in *Aspen Skiing*." *Id.* at 409. It is true the complaint "expressly alleges that IID had a preexisting importing relationship with CAISO." (Doc. No. 18 at 24.) However, the Court cannot agree with IID's representation that "after increasing IID's MIC to 1400 MW in July 2014, CAISO reduced IID's MIC to 462 MW" allegedly due to SONGS' closure. (*Id.* at 25–26.) This is a misstatement of the complaint. CAISO did not *increase* IID's MIC in July 2014; CAISO announced plans to *prospectively increase* IID's MIC to take effect in 2019. (Doc. No. 1 ¶ 141) ("in CAISO's 2012-2013 Transmission Plan dated March 20, 2013, CAISO acknowledged that *the target MIC for the year 2019 and thereafter from IID was 1400 MW*") (emphasis added). CAISO and IID's voluntary relationship historically permitted IID to import 462 MW onto CAISO's grid. (Doc. No. 1 ¶ 94.) Unlike in *Aspen Skiing Co.*, CAISO did not unilaterally terminate their course of dealing; it simply maintained their course of dealing at the status quo. *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 4 F. Supp. 3d 1123, 1138 (D. Ariz. 2014) ("[C]ourts are loathe to interfere when the claim is that the defendant is actually dealing, but only on disadvantageous or onerous terms.") (internal citation and quotation marks omitted).

Even assuming CAISO's conduct constitutes a unilateral termination of their prior course of dealing, there are no facts to suggest CAISO was "willing[] to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409. IID alleges that in 2014, CAISO announced that IID's prospective MIC was reduced to its historic level of 462 MW. (Doc. No. 1 ¶ 152.) IID further alleges CAISO announced that deliverability from the Imperial zone had increased by 1000 MW, but that CAISO itself was expected to utilize that increased import capability. (*Id.* ¶ 153.) Yet, the reservation of the additional import capacity from the Imperial zone for itself would suggest that CAISO "was not forsaking short-term profits . . . , but rather was attempting to increase its short-term profits." *MetroNet Servs. Corp.*, 383 F.2d at 1132. Accordingly, this factor "'sheds no light' upon whether [CAISO] was 'prompted not by competitive zeal but by anticompetitive malice.'" *Id.* (quoting *Trinko*, 540 U.S. at 410). The Court therefore

concludes that IID has failed to allege a refusal to deal claim.

### 2.    Essential Facilities

"The 'essential facilities' doctrine imposes on the owner of a facility that cannot reasonably be duplicated and which is essential to competition in a given market a duty to make that facility available to its competitors on a nondiscriminatory basis." *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 983 (9th Cir. 1988) (internal citation omitted). In order to prevail on such a claim, a plaintiff must establish "(1) that [defendant] is a monopolist in control of an essential facility, (2) that [plaintiff, as defendant's competitor], is unable reasonably or practically to duplicate the facility, (3) that [defendant] has refused to provide [plaintiff] access to the facility, and (4) that it is feasible for [defendant] to provide such access." *MetroNet Servs. Corp.*, 383 F.3d at 1128–29 (citing *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1380 (9th Cir. 1992)). While the Supreme Court has never recognized the essential facilities doctrine, in considering it, the Court stated that "the indispensable requirement for invoking the doctrine is the unavailability of access to the 'essential facilities'; *where access exists, the doctrine serves no purpose*." *Trinko*, 540 U.S. at 411 (emphasis added). The Court further provided that "essential facility claims should . . . be denied where a state or federal agency has effective power to compel sharing and to regulate its scope and terms." *Id.* (internal citation and quotation marks omitted).

CAISO challenges the viability of an essential facilities claim, not by arguing the elements are not met, but rather by focusing on the Supreme Court's guidance in *Trinko*. (*See* Doc. No. 16-1 at 25–26.) CAISO argues an essential facilities claim must fail because FERC Order No. 888 "requires [it to] provide open, non-discriminatory access to transmission service," and FERC "has the power to compel and regulate the scope of that access." (*Id.* at 26) (citing *S.C. Pub. Serv. Auth. v. F.E.R.C.*, 762 F.3d 41, 56 (D.C. Cir. 2014)). IID does not argue that FERC lacks this authority, but rather that "[t]he decision to reduce the MIC . . . was not approved by FERC." (Doc. No. 18 at 27.)

A monopolization claim under the essential facilities doctrine must fail. First, there

is no dispute that IID has historically enjoyed, and will continue to enjoy, access to CAISO's grid up to 462 MW. As the Supreme Court observed in *Trinko*, "[W]here access exists, the doctrine serves no purpose." 540 U.S. at 411. Second, IID's contention that "[t]he decision to reduce the MIC . . . was not approved by FERC" carries no clout. (Doc. No. 18 at 27.) As discussed above, even if CAISO calculated IID's prospective MIC pursuant to its BPM and not its tariff, CAISO's tariff must control if there is any conflict. *See supra* Discussion Section I.B.3. IID does not argue that CAISO's tariff does not provide for import capacity or FERC oversight of the setting of import capacity. Nor can it, given that CAISO's tariff provides a "13-step process . . . for assigning resource adequacy import capability," *Cal. Indep. Sys. Operator Corp.*, 119 FERC ¶ 62,014, FERC "accept[ed] CAISO's commitment to file quarterly reports" on "import capability transactions," *id.* ¶ 62,017, and CAISO could be subject to fines up to $1 million for failure to comply with its duties under its tariff, *see* 16 U.S.C. § 825o. Because FERC has "the power to compel sharing" pursuant to CAISO's tariff, IID's essential facilities claim must be denied. *Trinko*, 540 U.S. at 411. Accordingly, the Court concludes IID has failed to allege an essential facilities claim.[13]

---

[13] IID relies on *Snake River Valley Elec. Ass'n v. PacifiCorp*, 357 F.3d 1042 (9th Cir. 2004) [hereinafter *Snake River*], to support its position that it has sufficiently stated an essential facilities claim. (*See* Doc. No. 18 at 26–27.) That case does not require a contrary conclusion. In *Snake River*, the Ninth Circuit noted the dispositive factors to the Supreme Court's finding of antitrust liability in *Otter Tail*, 410 U.S. 366 (1973), were the defendant's monopoly power coupled with its refusal to "wheel," or transmit, wholesale power over its transmission lines. *Snake River*, 357 F.3d at 1051. IID extrapolates from *Snake River* and *Otter Tail* to conclude that CAISO, which allegedly enjoys monopoly power over electric transmission services in California, should likewise be accountable for antitrust liability. Not so. The case at bar differs from *Snake River* and *Otter Tail* in a significant respect: the defendants in those cases wholly refused to wheel the plaintiff's wholesale power. *See Otter Tail*, 410 U.S. at 371; *Snake River*, 357 F.3d at 1045. Here, CAISO will continue to wheel 462 MW of IID's power. To the extent it is entitled to more import capacity under CAISO's tariff, IID should seek relief from FERC, a federal entity with the power "to compel sharing and to regulate its scope and terms." *Trinko*, 540 U.S. at 411.

1

### 3.    "Other" Conduct

2        IID argues that its complaint "alleges a wide range of exclusionary and predatory

3    conduct supporting" its antitrust claims and thus should not be pigeonholed into these

4    two theories of liability. (Doc. No. 18 at 24.) CAISO counters that, notwithstanding IID's

5    claims to the contrary, IID "did not specify, either in its [c]omplaint or its [o]pposition,

6    what 'other' exclusionary conduct it pleads or what other theories it asserts." (Doc. No.

7    20 at 13) (citing *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376

8    F.3d 1065, 1076 (11th Cir. 2004)). The Court agrees with CAISO.

9        IID has failed, both in its complaint and opposition, to identity any theory of

10   exclusionary conduct in which CAISO has engaged other than refusal to deal and

11   essential facilities. Simply stating its complaint has alleged "exclusionary conduct [that]

12   goes far beyond" these two theories and citing to nearly half of its complaint does not

13   save its claims where a review of the complaint reveals no theories of exclusionary

14   conduct other than refusal to deal and essential facilities. (Doc. No. 20 at 24) (citing Doc.

15   No. 1 ¶¶ 3–6, 79–168). *Cf. Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034–35

16   (9th Cir. 2001) (stating plaintiffs had presented only two types of alleged antitrust injury,

17   notwithstanding their allegation that defendants engaged in "a whole host of

18   anticompetitive practices"). CAISO's exclusionary conduct centers on an alleged

19   agreement to increase IID's prospective MIC and subsequent reduction to that MIC

20   following IID's investment in the Path 42 upgrades. (Doc. No. 1 ¶¶ 94–103, 116–17, 120,

21   131–32, 144–46, 152–55.) Absent identification of another specific theory of

22   exclusionary conduct, the Court concludes the only two theories alleged on the basis of

23   CAISO's actions are refusal to deal and essential facilities.[14] The Court accordingly

24

25   _____

26   [14] IID itself identified CAISO's alleged exclusionary conduct as "Essential Facility,

27   Refusal to Deal, and Leveraging." (Doc. No. 1 ¶¶ 84–85.) *See also Snake River*, 357 F.3d

28   at 1044 n.2 (defining essential facilities as encompassing leveraging, stating it "applies to
     a competitor's refusal to deal when the competitor has monopolistic control over an

rejects IID's position that it has alleged "a wide range of exclusionary and predatory

conduct" on which it predicates its antitrust claims.

**B.    Antitrust Injury**

In addition to pleading exclusionary conduct, a plaintiff alleging a monopolization

claim must also plead antitrust injury. *MetroNet Servs. Corp.*, 383 F.3d at 1130. To do so,

the plaintiff must plead more than mere injury "caused by an antitrust violation." *Glen

Holly Entm't, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1007–08 (9th Cir. 2003). Rather, the

plaintiff must plead the four elements of antitrust injury: "(1) unlawful conduct, (2)

causing an injury to the plaintiff, (3) that flows from that which makes the conduct

unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad

Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999); *see Brunswick Corp v.

Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The injury antitrust law is intended

to prevent is "harm to the process of competition and consumer welfare, not harm to

individual competitors." *LiveUniverse, Inc. v. MySpace, Inc.*, 304 Fed. Appx. 554, 557

(9th Cir. 2008) (citing *Cascade Health Solutions*, 515 F.3d at 901).

CAISO argues IID has failed to allege antitrust injury in that all of its identified

injuries are to itself, not to competition.[15] (Doc. No. 16-1 at 27–28.) In its opposition, IID

_____

essential facility in one market and uses that monopoly power to *leverage* returns from
different markets by refusing to share access to the essential facility") (emphasis added).
[15] CAISO also attacks IID's allegation of antitrust injury on the basis that it has not
sufficiently alleged they are competitors. (Doc. No. 16-1 at 26–27.) The Court agrees it is
far from clear how the parties compete in either of the identified markets. *See supra*
Discussion Section I.B.3 n.8. IID identifies the relevant geographic parameters of each
market as the State of California. (Doc. No. 1 ¶¶ 75–76.) Yet, in the transmission service
market, IID alleges each balancing authority "operates the transmission system that
transmits electric energy *within its BAA*." (*Id.* ¶¶ 48, 60) (emphasis added). Similarly, in
the transmission operations services market, IID alleges the balancing authorities
"perform services *within their BAAs* . . . ." (*Id.* ¶ 74) (emphasis added). Given that each
balancing authority operates exclusively within their own BAAs, it would appear, to the
extent the entities require access to the other's grid, that each is a customer of the other,
not a competitor. *See supra* Discussion Section I.B.3 n.8. This is consistent with IID's

alleges it has been injured in the following ways: its operations have been constrained; the $35 million IID spent on the Path 42 upgrades represents "stranded investments"; the loss of revenue from agreements with renewable energy developers who bypass IID's grid and interconnect directly with CAISO; and CAISO's unauthorized and uncompensated use of IID's grid. (Doc. No. 18 at 28–29.) Yet, these injuries are injuries to *IID*, not to *competition*. *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812 (9th Cir. 1988) ("It is injury to the market or to competition in general, not merely injury to individuals or individual firms that is significant.") (internal citation omitted).

However, in its complaint, IID alleges injuries that go beyond injury to only IID's operations. For example, IID alleges that because of the reduction to its prospective MIC, load serving entities ("LSEs") within CAISO's BAA have limited ability to purchase renewable energy from generators located within IID's BAA. (Doc. No. 1 ¶ 176.) This prevents generators within IID's BAA from competing with generators within CAISO's BAA, and LSEs seeking renewable energy likely must pay higher prices as a result. (*Id.* ¶¶ 176–77.) IID further alleges that certain renewable energy projects already underway that have interconnected with IID's grid are unlikely to secure agreements with LSEs in CAISO's BAA absent the additional prospective MIC. (*Id.* ¶ 179.) IID alleges this inability to secure such agreements jeopardizes the economic viability of those projects. (*Id.*) IID also alleges that its inability to recoup its $35 million investment from new

---

allegations that it has been injured by CAISO's uncompensated use of IID's grid. (*See* Doc. No. 18 at 25) ("CAISO and IID had a voluntary relationship whereby each received fees for transmission services and transmission operation services derived from the transmission of electricity between one another's [BAA]"). (*Cf.* Doc. No. 1 ¶¶ 168, 203–05) (alleging CAISO used IID's transmission grid to import substantial out-of-state power without compensation to IID). However, that does not end the inquiry. As CAISO acknowledges, "only a plaintiff that participates as a competitor *or a consumer* in the relevant market can suffer antitrust injury." (Doc. No. 26) (citing *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013)) (emphasis added). IID's apparent status as a consumer of CAISO's electric transmission services therefore does not foreclose its ability to allege antitrust injury.

26

wholesale customers located within CAISO's grid will result in increased costs and a degradation of service to IID's current retail and wholesale customers. (*Id.* ¶ 180.)

Allegations of injuries such as these sufficiently allege antitrust injury. *See McGlinchy*, 845 F.2d at 812. The Court therefore rejects CAISO's argument that IID has failed to allege antitrust injury. However, because IID has failed to sufficiently plead exclusionary conduct, the Court **GRANTS** CAISO's motion to dismiss and **DISMISSES WITHOUT PREJUDICE** IID's monopolization claim. Because exclusionary conduct is also an essential element of an attempted monopolization claim, that claim necessarily fails. *See LiveUniverse, Inc.*, 304 Fed. Appx. at 557 ("A claim for attempted monopolization requires allegations of anticompetitive conduct and antitrust injury. As discussed above, LiveUniverse failed to allege anticompetitive conduct and antitrust injury. Because attempted monopolization requires pleading these same elements, LiveUniverse's claim necessarily fails." (citing *Cascade Health Solutions*, 515 F.3d at 893; *Image Technical Servs.*, 125 F.3d at 1202). Accordingly, the Court also **DISMISSES WITHOUT PREJUDICE** IID's attempted monopolization claim.

### Conclusion

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** CAISO's motion to dismiss IID's complaint. The Court **DENIES** CAISO's motion to the extent it argues the filed rate doctrine applies to IID's claims that are predicated on the alleged miscalculation of its MIC under the tariff. The Court also **DENIES** CAISO's motion to the extent it argues the primary jurisdiction doctrine applies. The Court **GRANTS** CAISO's motion in all other respects. The Court therefore **DISMISSES WITHOUT PREJUDICE** IID's claims as follows: the state law claims for breach of implied contract, *quantum meruit*, and restitution as preempted by the filed rate doctrine;

//

//

//

//

the state law conversion claim as field preempted; and the monopolization and attempted monopolization claims in violation of § 2 of the Sherman Act as failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).

**IT IS SO ORDERED.**

Dated:  November 24, 2015

Hon. Anthony J. Battaglia
United States District Judge

28

15-CV-1576-AJB-RBB